## IN THE CIRCUIT COURT OF WISE COUNTY
## COMMONWEALTH OF VIRGINIA

| | |
|---|---|
| SOUTHERN COAL CORPORATION and A&G COAL CORPORATION, | |
| Plaintiffs, | |
| v. | CIVIL ACT. NO. _____ |
| NORFOLK SOUTHERN CORPORATION and NORFOLK SOUTHERN RAILWAY COMPANY, | |
| Defendants. | |

## COMPLAINT

NOW COME Plaintiffs Southern Coal Corporation and A&G Coal Corporation, in the above-styled action, and make and file this complaint requesting temporary and permanent injunctive relief and monetary damages against Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company. In support thereof, Plaintiffs respectfully show as follows:

### PARTIES

1.      Plaintiff Southern Coal Corporation ("Southern Coal") is a Delaware corporation with its principal place of business at 818 North Eisenhower Drive, Beckley, West Virginia 25801.

2.      Plaintiff A&G Coal Corporation ("A&G Coal") is a Virginia corporation with its principal place of business at 144 Lake Street, Wise, Virginia 24293.

3.      Defendant Norfolk Southern Corporation is a Virginia corporation with its principal place of business at Three Commercial Place, Norfolk, Virginia 23510, and may be served through its registered agent at the same address.

EXHIBIT 1

4.      Defendant Norfolk Southern Railway Company is a Virginia corporation with its principal place of business at Three Commercial Place, Norfolk, Virginia 23510, and may be served through its registered agent at the same address.

5.      Norfolk Southern Corporation is the parent of and controls Norfolk Southern Railway Company, which is the corporate entity that operates Norfolk Southern railroads. These two Defendants will collectively be referred to as "Norfolk Southern" in this Complaint.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction of this action pursuant to sections 17.1-513 and 8.01-620 of the Virginia Code.

7.      This Court has personal jurisdiction over both defendants pursuant to: (a) Virginia Code section 8.01-328.1(A)(1), because defendants have transacted business in this Commonwealth; (b) section 8.01-328.1(A)(2), because defendants have contracted to supply services in this Commonwealth; and (c) section 8.01-328.1(A)(3), because defendants have caused tortious injury by an act or omission in this Commonwealth.

8.      Venue is proper in this Court pursuant to Virginia Code sections 8.01-261(15)(c) and 8.01-262(3).

## FACTUAL ALLEGATIONS

9.      A&G Coal owns and operates coal mines in western Virginia, including in Wise County.  Southern Coal is A&G Coal's corporate parent.  Southern Coal and A&G Coal depend primarily upon transportation by rail to deliver their coal to market (Southern Coal and A&G Coal will hereinafter be referred to collectively as "Southern Coal").

10.      Norfolk Southern is the sole rail carrier providing service to A&G Coal's mines and loading facilities in Wise County, Virginia.  Southern Coal relies upon Norfolk Southern —

2

pursuant to both contractual obligations and obligations imposed upon Norfolk Southern as a common carrier by the Interstate Commerce Act — to provide adequate and timely rail service to deliver its coal to domestic customers and to port facilities for export by ocean-going vessel.

11.     On numerous occasions in the past, Norfolk Southern has failed to meet its contractual and statutory obligations to deliver sufficient rail cars on a timely basis for delivery of Southern Coal's coal to its customers. Beginning approximately one year ago, this failure to provide rail cars on a timely basis began to worsen. Norfolk Southern's performance has deteriorated significantly in recent months. In particular, in violation of its contractual and statutory obligations, Norfolk Southern has repeatedly failed to provide to Southern Coal trains as promised, failed to timely provide to Southern Coal trains on agreed upon dates, and failed to provide to Southern Coal sufficient trains to meet its delivery needs.

12.     As a result of Norfolk Southern's failure to meet its obligations, Southern Coal has lost sales, been forced to sell coal at reduced prices because of the inability to meet delivery dates, and suffered a significant decline in the volume of coal it has been able to deliver to its customers. Because of these lost sales, forced lower prices, and decline in volume of coal deliveries all caused by Norfolk Southern, Southern Coal has lost profits and suffered a decline in value of several hundred million dollars.

13.     Southern Coal has repeatedly complained to Norfolk Southern about its failures to meet its contractual and statutory obligations to provide adequate rail service to Southern Coal, including in a meeting last May, discussions in early September and a letter sent to Norfolk Southern on December 30, 2010. Norfolk Southern has acknowledged these problems to Southern Coal and has repeatedly promised to fix them; but the problems are only getting worse.

3

14.     Norfolk Southern is well aware of its duties as a common carrier to provide adequate rail service to all of the customers in the discrete areas that it serves.   These duties are imposed in large part by the Interstate Commerce Act and arise from the fact that rail carriers such as Norfolk Southern are granted, in effect, a monopoly over rail service in the areas that they serve such that their customers are completely dependent upon them to move their goods to market.  These duties also arise in some instances by contract.

15.     Norfolk Southern likewise is well aware that for many months it has failed to meet these duties.  Not only have they acknowledged this to Southern Coal employees, but their failures have been widely discussed in the industry and have been the subject of an investigation by an independent research group at a well-known investment bank, UBS, which concluded as follows:

> "Some of the coal producers have been up in arms recently, attributing recent Q4 profit warnings in large part to poor railroad service, particularly in the East . . . Our analysis indicates the coal producers have a valid argument.  The service issues are indeed in the East, not the West, and the trail of evidence leads to Norfolk Southern, rather than CSX [the other primary rail carrier in the East], as NS has struggled to maintain service levels while digesting a 10% snap-back in coal volumes last year.   It's impacting both domestic and export deliveries, with delayed high-margin export shipments particularly painful for the coal producers."

January 9, 2011, UBS Investment Research report.

16.     As a further result of Norfolk Southern's failures, Southern Coal's customers have complained about failed and/or delayed deliveries of coal from Southern Coal.  These complaints have been communicated, both by Southern Coal and by Southern Coal's customers, to Norfolk Southern.  These complaints have placed in jeopardy Southern Coal's sales to and relationships with its customers.

4

17.     More alarming, it has recently come to Southern Coal's attention that, in an effort to shift the blame for its own repeated failures from itself to Southern Coal, Norfolk Southern has made false, defamatory and disparaging statements to Southern Coal's customers and/or their agents.  In particular, Southern Coal has learned that Norfolk Southern has told the following falsehoods to Southern Coal's customers and/or their agents:

(1)     that Southern Coal did not have sufficient coal to deliver to the customer;

(2)     that Southern Coal could not deliver the specified coal to the customer in question because it had sold the coal to another customer;

(3)     that Southern Coal would be unable to perform its contract with the customer; and

(4)     that Southern Coal is known in the market "as a non performing company."

These statements, and each of them, were and are false and were made without any basis whatsoever.

18.     As a result of these false, defamatory and disparaging statements, Norfolk Southern has placed in jeopardy Southern Coal's contracts and business opportunities with these customers.  These customers have expressed alarm and worry regarding Southern Coal's ability to deliver coal as promised and have sought reassurances that the statements by Norfolk Southern are untrue and that Southern Coal can in fact perform its contracts and deliver coal as promised.

19.     These contracts and business opportunities that Norfolk Southern has wrongfully placed in jeopardy are worth hundreds of millions of dollars to Southern Coal.

5

20.     If Norfolk Southern continues to fail to meet its contractual and statutory obligations, and if it is successful in defaming Southern Coal's business reputation and disparaging its ability to provide product, A&G Coal's and Southern Coal's very existence is at stake.

## COUNT I
## Defamation and Product Disparagement

21.     Plaintiffs hereby incorporate all paragraphs of the Complaint, both above and below, as though fully set forth here.

22.     The false statements made by Norfolk Southern to Southern Coal's customers about Southern Coal, as described above, were known by Norfolk Southern to be false or were made by Norfolk Southern with reckless and utter disregard for their truth and without any basis whatsoever to believe they were true.

23.     These false statements were made by Norfolk Southern with the intent to cause harm to Southern Coal and/or with reckless and utter disregard for the harm they would cause to Southern Coal.

24.     These false statements made by Norfolk Southern constitute defamation *per se*, common law defamation, and product disparagement.

25.     As a result of these false, defamatory and disparaging statements, Southern Coal has suffered and continues to suffer irreparable harm and damages.

26.     The conduct and statements of Norfolk Southern were made in a reckless manner, with malicious intent, and evince a conscious disregard for the rights and reputation of Southern Coal.

## COUNT II
### Tortious Interference with Contract and Business Relationships

27.     Plaintiffs hereby incorporate all paragraphs of the Complaint, both above and below, as though fully set forth here.

28.     The false statements of Norfolk Southern, along with Norfolk Southern's failure to perform its contractual and statutory obligations, all as described herein, constitute tortious interference with A&G Coal's and Southern Coal's sales contracts with its customers, as well as tortious interference with business opportunities and relationships with both existing and potential customers of A&G Coal and Southern Coal.

29.     As a result of this tortious interference, A&G Coal and Southern Coal have suffered and continue to suffer irreparable harm and damages.

## COUNT III
### Breach of Contract

30.     Plaintiffs hereby incorporate all paragraphs of the Complaint, both above and below, as though fully set forth here.

31.     A&G Coal's delivery of coal on Norfolk Southern's rail lines to certain of its customers, primarily export customers, is made pursuant to a Transportation Contract between A&G Coal and Norfolk Southern.

32.     Norfolk Southern's failures to deliver adequate and timely service, as described herein, constitute breaches of the Transportation Contract between A&G Coal and Norfolk Southern.

33.     As a result of these breaches, A&G Coal has suffered and continues to suffer irreparable harm and damages.

7

## COUNT IV
## Breach of Statutory Obligations

34.     Plaintiffs hereby incorporate all paragraphs of the Complaint, both above and below, as though fully set forth here.

35.     As alleged above, Norfolk Southern owes common carrier duties to A&G Coal and Southern Coal under the Interstate Commerce Act, 49 U.S.C.A. §§ 1, *et seq.*

36.     In particular, and without limitation, Norfolk Southern owes A&G Coal and Southern Coal a duty to provide rail transportation and service upon reasonable request under 49 U.S.C.A. § 11101(a); a duty to furnish adequate car service and establish and observe reasonable rules and practices under 49 U.S.C.A. § 11121(a)(1); and a duty to establish reasonable rules and practices relating to its transportation and service under 49 U.S.C.A. § 10702(2).

37.     As a result of the failures and actions of Norfolk Southern as described above, Norfolk Southern has breached and continues to breach its statutory duties and obligations.

38.     As a result of these breaches, A&G Coal and Southern Coal have suffered and continue to suffer irreparable harm and damages.

## REMEDIES REQUESTED

39.     Plaintiffs hereby incorporate all paragraphs of the Complaint, both above and below, as though fully set forth here.

40.     Southern Coal requests that this Court award temporary injunctive relief against Norfolk Southern to:

(a)     enjoin Norfolk Southern from continuing to make false and disparaging remarks about Southern Coal;

(b)     require Norfolk Southern to retract, repudiate, or correct the false and disparaging remarks about Southern Coal; and

8

(c)     require Norfolk Southern to promptly identify and disclose to the Court and to Southern Coal the Norfolk Southern employee(s) who made the defamatory remarks.

41.    Southern Coal requests that this Court award permanent injunctive relief against Norfolk Southern to:

(a)     permanently enjoin Norfolk Southern from making false, defamatory or disparaging remarks about Southern Coal; and

(b)     order Norfolk Southern to comply with its contractual and statutory obligations to provide adequate rail service, including timely providing A&G Coal with the necessary cars it needs for loading at its Paragon, Ramsey, and Cane Patch loading facilities in Wise County, Virginia, and at its other loading facilities.

42.    As a direct result of Norfolk Southern's wrongful actions, as described herein, Southern Coal has suffered lost profits and diminished value of over $500 million.  In addition, because Norfolk Southern's defamatory statements and tortious conduct have occurred behind A&G Coal's and Southern Coal's backs, and because the full consequences of Norfolk Southern's wrongful conduct are still unknown, it is impossible at this time to quantify the full extent of harm and damages to Southern Coal and A&G Coal caused by this wrongful conduct.

43.    Because Norfolk Southern breached, and continues to breach, its contractual and statutory obligations to Southern Coal and A&G Coal, Southern Coal and A&G Coal are entitled to exemplary damages.

9

44. Because Norfolk Southern acted in a reckless manner with malicious intent and/or a conscious disregard for the rights of Southern Coal and A&G Coal, Southern Coal and A&G Coal are entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Southern Coal and A&G Coal respectfully request that this Court enter judgment in their favor, and against Norfolk Southern:

(a) award temporary injunctive relief;

(b) award permanent injunctive relief;

(c) award Southern Coal and A&G Coal their compensatory damages of at least $500 million, plus applicable prejudgment and statutory interest;

(d) award Southern Coal and A&G Coal exemplary damages;

(e) award Southern Coal and A&G Coal punitive damages; and

(f) award such other and further relief as is just.

## JURY DEMAND

Trial by jury is requested on all counts. For any other matters associated with the injunctive relief requested in this Complaint, Southern Coal and A&G Coal request and preserve their right to a jury trial to the maximum extent, and in the manner prescribed, under Virginia Code §§ 8.01-188, 8.01-336(D-E), and Rules 3:21 (a-c) and 3:22(c-d) of the Rules of the Virginia Supreme Court.

10

Respectfully submitted, this 27th day of January, 2011.

_____
Elsey A. Harris III
Virginia Bar No. 19772
Mullins, Harris & Jessee
A Professional Corporation
The Law Building
30 Seventh Street
P.O. Box 1200
Norton, Virginia 24273-0912
(P) (276) 679-3110
(F) (276) 679-3113

KING & SPALDING LLP
J Kevin Buster (*Pro Hac Vice* pending)
Georgia Bar No. 099267
Benjamin F. Easterlin (*Pro Hac Vice* pending)
Georgia Bar No. 237650
1180 Peachtree Street NE
Atlanta, Georgia 30309
(P) (404) 572-4600
(F) (404) 572-5100

*Attorneys for Plaintiffs Southern Coal
Corporation and A&G Coal Corporation*

11

# IN THE CIRCUIT COURT OF WISE COUNTY
## COMMONWEALTH OF VIRGINIA

SOUTHERN COAL CORPORATION, and
A&G COAL CORPORATION,
       Plaintiffs,

     v.

NORFOLK SOUTHERN CORPORATION
and NORFOLK SOUTHERN RAILWAY
COMPANY,

       Defendants.

CIVIL ACT. NO. _____

---

## PLAINTIFFS' MOTION FOR TEMPORARY INJUNCTION
## AND MEMORANDUM OF LAW IN SUPPORT

Plaintiffs Southern Coal Corporation and A&G Coal Corporation (collectively "Plaintiffs" or "Southern Coal") hereby move for an immediate temporary injunction to prohibit Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company (collectively "Defendants" or "Norfolk Southern") from continuing to make false, defamatory, and disparaging remarks about Southern Coal and to require Norfolk Southern to retract, repudiate, or correct the false and disparaging remarks about Southern Coal. In further support of this motion and memorandum of law in support, Southern Coal submits the Affidavit of James C. Justice III ("Justice Aff."), which is attached hereto.

## FACTUAL BACKGROUND

A&G Coal owns and operates a number of coal mines and loading facilities in western Virginia, including in Wise County. *See* Justice Aff. ¶ 4. A&G Coal, together with its subsidiary Nine Mile Mining, Inc., is the largest employer in Wise County, employing approximately 600 individuals. *Id.* Virtually all of the coal produced in A&G Coal's mines is

transported to market by rail. *Id.* ¶ 5. Norfolk Southern is the sole rail carrier that services A&G Coal's mines and loading facilities in Wise County. *Id.* Norfolk Southern thus has a virtual monopoly on the railroad market in the Wise County area where A&G Coal primarily does business. *Id.*

Norfolk Southern has both contractual and statutory obligations to provide A&G Coal with timely rail car service. The satisfaction of these legal duties is particularly critical where, as here, A&G Coal has no viable alternative other than Norfolk Southern's trains for getting its product to its customers. *See id.* ¶¶ 8-9. For all practical purposes, A&G Coal is a captive consumer with no choice but to rely on Norfolk Southern's services for its coal mining operations to survive. *Id.* When Norfolk Southern fails to provide adequate, reliable, and timely rail service, Southern Coal's and A&G Coal's businesses suffer directly as a result. *Id.*

On numerous occasions in the past, Norfolk Southern has failed to meet its contractual and statutory obligations to deliver sufficient rail cars on a timely basis for delivery of A&G Coal's coal to its customers. *See id.* ¶¶ 10-21. Beginning approximately one year ago, this failure to provide rail cars on a timely basis began to worsen. *Id.* ¶¶ 10-11. Norfolk Southern's performance has steadily deteriorated significantly over recent months. *Id.* ¶¶ 15-19. In numerous instances, Norfolk Southern has been unable to provide adequate rail cars in a timely fashion; in other instances, Norfolk Southern could not provide the requested rail cars at all. *Id.* ¶¶ 12, 21. Because of Norfolk Southern's failure to meet its legally required obligations, A&G Coal has lost sales, been forced to sell coal at reduced prices, and suffered a significant decline in the volume of coal it has been able to deliver to its customers. *Id.* ¶¶ 15-19.

A&G Coal and Southern Coal have repeatedly complained to Norfolk Southern about its failure to meet its contractual and statutory obligations to provide adequate rail service, including

in a meeting in May 2010, in discussions in early September 2010, and in a letter sent to Norfolk Southern on December 30, 2010. *Id.* ¶¶ 11, 16. While Norfolk Southern has generally acknowledged these problems, they only continue to get worse. *Id.* ¶ 21. Indeed, Norfolk Southern's failures have been widely discussed in the industry and have been the subject of an investigation by an independent research group at a well-known investment bank, UBS, which concluded as follows in a January 9, 2011 report:

> Some of the coal producers have been up in arms recently, attributing recent Q4 profit warnings in large part to poor railroad service, particularly in the East. . . . Our analysis indicates the coal producers have a valid argument. The service issues are indeed in the East, not the West, and the trail of evidence leads to Norfolk Southern, rather than CSX [the other primary rail carrier in the East], as NS has struggled to maintain service levels while digesting a 10% snap-back in coal volumes last year. It's impacting both domestic and export deliveries, with delayed high-margin export shipments particularly painful for the coal producers.

Justice Aff. ¶ 13 (quoting UBS Investment Research, *Rail Coal Transportation* at 1 (Jan. 19, 2011) (attached as Ex. A to Justice Aff.)).

As a result of Norfolk Southern's failures, Southern Coal's customers have complained about delayed and failed deliveries of coal. Southern Coal has now learned to its great surprise and dismay that Norfolk Southern, in an effort to shift the blame from itself to Southern Coal for its own repeated failures, has been making false, defamatory, and disparaging statements about Southern Coal to its customers and their agents. *See* Justice Aff. ¶¶ 22.

These baseless accusations were recently made by Norfolk Southern to two new and important customers of A&G Coal and Southern Coal — Ilva S.p.a. ("Ilva") and Lucchini S.p.a. ("Lucchini") — two of the three largest steel producers in Italy. *Id.* ¶¶ 23-35. Southern Coal and its subsidiaries have been working for several years to expand into the Italian market. *Id.* ¶ 23.

3

In late 2010, A&G Coal entered into sales contracts for "test shipments" of high volatile metallurgical coal to Ilva and Lucchini. *Id.* Together, these contracts represent a business opportunity worth approximately $175 million in potential revenue in the next year alone. *Id.*

If A&G Coal successfully performs on these test shipments, delivering its product in a timely fashion in accordance with the contract specifications, the parties have agreed to enter into year-long purchase contracts for substantially greater quantities of coal. *Id.* ¶ 25. A year of testing has already taken place, and coal so far has met these customers' specifications. *Id.* The terms of these year-long contracts have already been negotiated, though they have not been finalized with signatures. For sales to Ilva, this would mean the sale of an additional 537,600 tons of high volatile metallurgical coal over the next year. *Id.* For Lucchini, it would mean the sale of 89,600 to 134,400 tons of coal over the first year, increasing to as much as 224,000 to 336,000 tons in subsequent years. *Id.* ¶ 32.

Despite the significance of these test shipments and the pending additional contracts with Ilva and Lucchini, Norfolk Southern has failed to provide timely rail car service to transport these test shipments of coal to Pier 6, Norfolk Southern's port at Lamberts Point in Norfolk, Virginia. *Id.* ¶ 28, 33. When Ilva and Lucchini and their agents inquired as to the reasons for the delay, Norfolk Southern responded by trying to place the blame on Southern Coal. *Id.* ¶ 28, 34. As detailed in e-mails from Ignazio Porcari, a third-party broker in Italy who helped arrange for these test shipments with Ilva and Lucchini, Norfolk Southern has offered the following falsehoods as excuses for the delay:

    (1)     that Southern Coal did not have sufficient coal to deliver to Ilva and Lucchini;

    (2)     that Southern Coal could not deliver the specified coal to Ilva because the coal had already been sold to another customer;

4

(3)     that Southern Coal would be unable to perform its contract; and

(4)     that Southern Coal is known in the market as a "non-performing" company.

*Id.* ¶¶ 28, 34 and Exs. B & C attached thereto. These statements, and each of them, were false when made and are false today and were made without any basis whatsoever. *Id.* ¶¶ 28, 34.

As a result of its false, defamatory, and disparaging statements, Norfolk Southern has placed in jeopardy Southern Coal's contracts and business opportunities with Ilva and Lucchini. *Id.* ¶¶ 36-39. In fact, both customers have expressed alarm and worry regarding Southern Coal's ability to deliver coal as promised and have sought assurances that the statements by Norfolk Southern are untrue and that Southern Coal can in fact perform its contracts and deliver coal as promised. *Id.* ¶ 36. The false and baseless accusations and statements made by Norfolk Southern have directly harmed Southern Coal's business reputation with these customers and their agents, and perhaps others. *Id.* ¶¶ 36-39. The contracts and business opportunities with Ilva and Lucchini alone are worth hundreds of millions of dollars to Southern Coal. *Id.* Indeed, the falsehoods repeated by Norfolk Southern threaten A&G Coal's and even Southern Coal's very existence. *Id.*

Norfolk Southern's continuing defamatory and disparaging conduct must be brought to an immediate stop. Likewise, Norfolk Southern must be required to retract, repudiate, or correct the defamatory statements in order to mitigate the harm that its false, defamatory, and disparaging statements have already caused. *Id.* ¶ 39. Moreover, to prevent the recurrence of these baseless comments, Southern Coal respectfully requests that the Court require Norfolk Southern to immediately identify and disclose those individuals who made these defamatory statements.

5

## LEGAL ARGUMENT AND CITATION OF AUTHORITY

### A.   Issuance of an Immediate Temporary Injunction Is Necessary to Adequately Remedy Norfolk Southern's Misconduct.

Pursuant to Virginia Code § 8.01-620, "[e]very circuit court shall have jurisdiction to award injunctions . . . ." Generally speaking, the purpose of an injunction is to "protect property or other rights from irreparable injury by prohibiting or commanding certain acts." 42 AM. JUR. 2D *Injunctions* § 1 (2010). Consistent with this objective, circuit courts in Virginia may issue both prohibitory injunctions (restraining the continued commission of an ongoing wrong or preventing the future commission of an anticipated wrong) as well as mandatory injunctions (undoing a wrong). *WTAR Radio-TV Corp. v. City Council of Virginia Beach*, 216 Va. 892, 894-95, 223 S.E.2d 895, 898 (1976); *see also Virginian R. Co. v. Echols*, 117 Va. 182, 184, 83 S.E. 1082, 1083 (1915).

Moreover, circuit courts in Virginia may issue not only permanent, but also temporary, injunctions. *See* VA. CODE §§ 8.01-628 (entitled "Equity of prayer for temporary injunction to be shown by affidavit or otherwise") and 8.01-624 (entitled "Duration of temporary injunctions to be fixed therein"). As the language in § 8.01-628 makes clear, the statutory test for whether to grant a temporary injunction is a broad one: ". . . the court shall be satisfied of the plaintiff's equity." Given this breadth of language, Virginia circuit courts have wide discretion when determining whether to grant a temporary injunction.

Until recently, the Virginia Supreme Court had not addressed the standard for issuing temporary injunctions. *See HotJobs.com, Ltd. v. Digital City, Inc.*, 53 Va. Cir. 36, 39, 2000 Va. Cir. LEXIS 191, at *6 (Mar. 8, 2000) (noting that "the Virginia Supreme Court has not set forth standards for granting or denying a preliminary injunction"). As a result, some circuit courts had urged the adoption of a four-factor balancing test generally recognized in federal courts: (1) the

likelihood of irreparable harm to the plaintiff if preliminary injunctive relief is denied; (2) the

likelihood of harm to the defendant if such relief is granted; (3) the likelihood of the plaintiff's

success upon the merits; and (4) the public interest. *See id.* at 39, 2000 Va. Cir. LEXIS 191, at

*7.

In 2007, however, the Virginia Supreme Court addressed "the factors necessary for the

issuance of temporary injunctive relief," pointing to two earlier Supreme Court decisions

involving injunctions generally. *GeoMet Operating Co., Inc. v. CNX Gas Co LLC*, 661 S.E.2d

139, 140 (2007) (citing *Black & White Cars, Inc. v. Groome Transportation*, 247 Va. 426, 431,

442 S.E.2d 391, 395 (1994); *Wright v. Castles*, 232 Va. 218, 224, 349 S.E.2d 125, 129 (1986)).

These cases focus on two core factors, holding that "[t]o secure an injunction, a party must show

irreparable harm and the lack of an adequate remedy at law." *Black & White Cars*, 247 Va. at

431, 442 S.E.2d at 395 (citing *Wright*, 232 Va. at 224, 349 S.E.2d at 129); *accord Levisa Coal

Co. v. Consol. Coal Co.*, 276 Va. 44, 61, 662 S.E.2d 44, 53 (2008) (noting that "a party must

establish the traditional prerequisites, i.e., irreparable harm and lack of an adequate remedy at

law before a request for injunctive relief will be sustained" (internal citations omitted)).[1]

Regardless of how the standard is articulated — the broad statutory test, the twin factors

identified by the Virginia Supreme Court (irreparable harm / inadequate remedy at law), or the

---

[1] In the circuit court in *Levisa*, the defendant had urged the application of the four-factor test noted above. The Supreme Court declined to address the issue and expressed "no view upon the matter." *Levisa Coal*, 276 Va. at 60 n.6, 662 S.E.2d at 53 n.6. Given this state of affairs, the Virginia legislature is currently considering amending the Virginia Code to specifically address the standards for issuing a temporary injunction. *See* Senate Bill No. 851 (proposing to amend Virginia Code § 8.01-628 to provide: "In assessing whether to award a temporary injunction, a court shall review the following factors: (i) the likelihood of irreparable harm to the party seeking the temporary injunction if the temporary injunction is denied; (ii) the likelihood of harm to the party not seeking the temporary injunction if the temporary injunction is granted; (iii) the likelihood that the party seeking the temporary injunction will succeed on the merits; and (iv) the public interest"). The Virginia Senate recently passed this Bill and has sent it to the House.

four-factor test previously used by some circuit courts — the fundamental requirements for a temporary injunction are the same: balancing of equities considering the irreparable harm to plaintiff and whether there is an adequate remedy at law. Under any of these articulations, the standard is met for issuance of a temporary injunction in this case.

1.  **Consideration of Plaintiffs' Equities and the Twin Factors of Irreparable Harm and No Adequate Remedy at Law Compel <u>Issuance of a Temporary Injunction in this Case.</u>**

The equities plainly lie with Southern Coal here. Norfolk Southern has made false, defamatory statements to Southern Coal's customers and its agents. These statements, set forth in the fact section above, impugn Southern Coal's business reputation and directly threaten its existing contracts and future business relationships and opportunities with two very important customers. If Southern Coal loses either or both of these customers, the harm it will suffer is incalculable and threatens its very existence. Under these circumstances, courts have readily found that the irreparable harm / inadequacy of legal remedy standard is met and an injunction must issue.

For example, in *HotJobs.com, Ltd. v. Digital City, Inc.*, 53 Va. Cir. 36, 2000 Va. Cir. LEXIS 191 (Mar. 8, 2000), the court found that "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Id.* at 45, 2000 Va. Cir. LEXIS 191, at *20 (quoting *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Op. Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (applying Virginia law)); *see also id.* at 45-46, 2000 Va. Cir. LEXIS 191, at *21) (citing *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 60 F. Supp. 2d 502 (M.D.N.C. 1999) (finding irreparable harm for "lost goodwill . . . and harm to their competitive positions in the industry").

8

Similarly, in *EG&G, Inc. v. The Cube Corp.*, 63 Va. Cir. 634, 2002 Va. Cir. LEXIS 444 (Dec. 23, 2002), the court reasoned that "a legal remedy is especially difficult to fashion where damages are too speculative to calculate, such as where the contract at issue may be extended or renewed based on performance which has not yet occurred, and where extra-contractual opportunities are also lost or jeopardized." *Id.* at 656, 2002 Va. Cir. LEXIS 444, at *54 (citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 98 F. Supp. 2d 362, 397-98 (S.D.N.Y. 2000) (injunction granted where future market circumstances made calculation of damages difficult and where, without an injunction, plaintiff would lose future opportunities in the relevant marketplace); *Aero Corp. v. Department of Navy*, 540 F. Supp. 180, 214 (D.D.C. 1982) (lost opportunities constitute irreparable injury "which no legal remedy could either value or redress")).

And in *Cornwell v. Sachs*, 99 F. Supp. 2d 695 (E.D. Va. 2000), the court reasoned that harm to reputation, by its very nature, constitutes irreparable harm: "Because [defendant] has already engaged in activity which harms [plaintiff's] reputation, [plaintiff] has also demonstrated that the irreparable harm 'is neither remote nor speculative, but actual and imminent.' " *Id.* at 707 (quoting *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citing *Dan River, Inc. v. Icahn*, 701 F.2d 278, 284 (4th Cir. 1983))).

All of the aspects found by these courts to constitute irreparable harm / inadequate remedy at law exist here. Southern Coal risks the possible loss of two significant customers and loss of goodwill; with both Ilva and Lucchini, the contracts for test shipments may ripen into annual contracts, which may then be further renewed, but these additional opportunities are in dire jeopardy of being lost; loss of such future business makes calculation of future damages "especially difficult" because the full extent of the harm depends on future events; and Southern

Coal's business reputation has been directly impugned in the most fundamental and harmful way by Norfolk Southern's false statements that Southern Coal is known in the market as "a non-performing" company, does not have enough of the very product it sells, and will not be able to perform its contracts with Ilva and Lucchini. *See generally* Justice Aff. ¶¶ 22-39.

### 2. The Additional Considerations Urged by Some Circuit Courts Only Strengthen the Case for a Temporary Injunction.

As mentioned above, some Virginia circuit courts previously adopted a four-factor federal test for preliminary junctions and this test is currently the subject of pending legislation: (1) likelihood of irreparable harm to the plaintiff if the injunction is denied; (2) likelihood of irreparable harm to the defendant if the injunction is granted; (3) likelihood that plaintiff will succeed on the merits; and (4) the public interest. The discussion in the proceeding section demonstrates that the first factor, irreparable harm to the plaintiff, is clearly met here. Likewise, the other factors only strengthen the grounds for granting the temporary injunctive relief requested here.

No harm to Norfolk Southern from granting an injunction. Norfolk Southern will suffer no harm if it is simply enjoined from making false, disparaging remarks and is required to retract its baseless accusations and identify its employees who made these statements. Norfolk Southern has no right to engage in such blatantly defamatory and tortious conduct and can hardly object to being prohibited from such action.

Southern Coal is likely to succeed on the merits. Southern Coal has prima facie claims for defamation as well as tortious interference with contract and business relationships. Indeed, the statements at issue here are defamatory *per se* as they are false statements made regarding Southern Coal's business and profession and were made to customers of Southern Coal and A&G and their agents. *See Hyland v. Raytheon Tech. Servs. Co.*, 277 Va. 40, 46, 670 S.E.2d

746, 750 (2009). Likewise, given the existing contracts with Ilva and Lucchini and the planned future business with these customers, Norfolk Southern's false and defamatory statements constitute tortious interference with both contracts and prospective business relationships. *Durrette Bradshaw, P.C. v. MRC Consulting, L.C.*, 277 Va. 140, 145, 670 S.E.2d 704, 706 (2009); *Williams v. Dominion Tech. Partners L.L.C.*, 265 Va. 280, 289, 576 S.E.2d 752, 757 (2003).

    <u>Enjoining Norfolk Southern is in the public interest.</u> The promotion of honest and fair business dealings is always in the public interest. Whatever private benefit Norfolk Southern believes it is obtaining by making these scurrilous charges (e.g., attempting to excuse and justify its own non-performance) plainly does not serve the interests of the public. Moreover, the baseless accusations against Southern Coal threaten not only its value and viability, but also, as a result, the jobs of the approximately 600 people A&G Coal and its subsidiary employs in Wise County, Virginia. Beyond that, Southern Coal and A&G Coal are competing in the global market place against coal suppliers across the world. Harm to the reputations and prospective and existing business opportunities of these two U.S. companies could result in the loss of U.S. exports if potential customers instead choose foreign suppliers.

    For these reasons, an immediate injunction should issue enjoining Norfolk Southern from continuing to make false, defamatory, and disparaging remarks about Southern Coal; requiring Norfolk Southern to retract, repudiate, or correct the false and disparaging remarks about Southern Coal; and requiring the immediate identification and disclosure to Southern Coal and the Court of the individuals at Norfolk Southern who made the above-described defamatory statements to Ilva and Lucchini and/or their agents. Southern Coal respectfully requests that this temporary injunction remain in place until after a full trial can be had on the merits.

**B.** **The Court Should Not Require Southern Coal to Post a Bond**

Under Virginia law, no bond is required from a party seeking injunctive relief when, in the discretion of the Court, a bond would be "unnecessary." VA. CODE § 8.01-631. The purpose of a bond is to protect the defendant from any damages caused by the injunction if the issuance of the injunction is later proven to be ill-advised. Here, no conceivable damages could result from stopping Norfolk Southern from making defamatory statements about Southern Coal and from correcting any such defamatory statements.

## CONCLUSION

For the foregoing reasons, Southern Coal and A&G Coal respectfully request that the Court grant this Motion for Temporary Injunction and enter an Order (1) enjoining Norfolk Southern from continuing to make false, defamatory, and disparaging remarks about Southern Coal or its subsidiaries until such time as the Court reaches a decision on the merits of this action or such other time as the Court may hereafter decide; (2) requiring Norfolk Southern to retract, repudiate, or correct the false, defamatory, and disparaging remarks about Southern Coal and its subsidiaries; (3) requiring Norfolk Southern to immediately disclose to the Court and Southern Coal the identity of the individual(s) at Norfolk Southern who made the above-described defamatory statements to Ilva and Lucchini and/or their agents; and (4) waiving the requirement for Southern Coal to post a bond.

Respectfully submitted, this the 27th day of January, 2011.

**(Signatures on next page.)**

12

Elsey A. Harris III
Mullins, Harris & Jessee
A Professional Corporation
The Law Building
30 Seventh Street, P.O. Box 1200
Norton, Virginia 24273-0912
(276) 679-3110
(276) 679-3113 (facsimile)


*Of Counsel:*
KING & SPALDING LLP
J Kevin Buster
    Georgia Bar No. 099267
Benjamin F. Easterlin
    Georgia Bar No. 237650
1180 Peachtree Street NE
Atlanta, Georgia  30309
(404) 572-4600
(404) 572-5100 (facsimile)

*Attorneys for Plaintiffs Southern Coal
Corporation and A&G Coal Corporation*

## IN THE CIRCUIT COURT OF WISE COUNTY
## COMMONWEALTH OF VIRGINIA

| | |
|---|---|
| SOUTHERN COAL CORPORATION and A&G COAL CORPORATION, | |
| Plaintiffs, | |
| v. | CIVIL ACT. NO. _____ |
| NORFOLK SOUTHERN CORPORATION and NORFOLK SOUTHERN RAILWAY COMPANY, | |
| Defendants. | |

COUNTY OF WISE

COMMON WEALTH OF VIRGINIA

### AFFIDAVIT OF JAMES C. JUSTICE III

James ("Jay") C. Justice III, having been first duly sworn, deposes and states the following:

1.     I am of legal age and competent to testify.  The matters stated herein are within my personal knowledge based upon information gained during the execution of my official duties for Southern Coal Corporation ("Southern Coal") and A&G Coal Corporation ("A&G Coal") as well as information provided to me by those under my supervision and control.

2.     I am currently an owner of Southern Coal Corporation, which in turn is the parent company of A&G Coal Corporation.  I am a Director and the Executive Vice president of Southern Coal and A&G Coal.

3.     I am familiar with Southern Coal's and A&G Coal's business operations and dealings, particularly as those business operations and dealings involve Norfolk Southern

1

Corporation and Norfolk Southern Railway Company (referred to collectively as "Norfolk Southern").

4.    Southern Coal and its subsidiaries own and operate coal mines in Virginia, West Virginia, Tennessee, and Kentucky. A&G Coal owns and operates coal mines in western Virginia, including in Wise County, Virginia. A&G Coal and its subsidiary Nine Mile Mining, Inc. employ approximately 600 people at their operations in Wise County.

## Southern Coal's and A&G Coal's Relationship with Norfolk Southern

5.    Coal produced from mines owned and operated by A&G Coal is typically hauled by truck to one of three loading facilities in Wise County: (1) the Paragon loading facility near Appalachia in Wise County, Virginia, (2) the Ramsey loading facility near Norton, Virginia, and (3) the Cane Patch loading facility near Kelleyview, Virginia. From these loading facilities, the coal is then transported by rail to market. Norfolk Southern is the only railroad company that services these three loading facilities. As a result, Norfolk Southern has a virtual monopoly on the railroad market in the areas in which A&G Coal does business.

6.    Rail cars loaded with coal at the Paragon, Ramsey, and Cane Patch loading facilities are transported to both domestic and international destinations. For international shipments, the coal is transported by rail by Norfolk Southern to Pier 6, Norfolk Southern's port and coal terminal at Lamberts Point in Norfolk, Virginia.

7.    Shipments of coal from A&G Coal to Pier 6 for export are governed, at least in part, by a Transportation Contract with Norfolk Southern. This Transportation Contract generally governs the rights and obligations of the parties in the transport of coal from the loading facilities to the pier.

2

8.     For domestic shipments, rail service may be set up by A&G Coal or by its customers.  In either case, for shipments from the Paragon, Ramsey, and Cane Patch loading facilities, this rail service is performed by Norfolk Southern as there is no other rail carrier that serves these loading facilities.

9.     Because Norfolk Southern is the only railroad company that services the Paragon, Ramsey, and Cane Patch loading facilities, Southern Coal and A&G Coal rely heavily on Norfolk Southern for their businesses to survive.  When Norfolk Southern fails to provide adequate, reliable, and timely rail service, Southern Coal's and A&G Coal's businesses suffer directly as a result.

## Problems with Norfolk Southern Rail Service

10.     In December 2009, Norfolk Southern represented to A&G Coal and other coal producers that Norfolk Southern wanted to increase exports of high volatility metallurgical coal through Pier 6, its port at Lamberts Point.  Despite sending this message, however, Norfolk Southern apparently did not prepare for an increase in the metallurgical coal business.  As a result, rail service to Pier 6 became, and continues to get, progressively worse.

11.     In spring of 2010, several representatives of Southern Coal and A&G Coal met with Norfolk Southern in Norfolk Southern's offices.  During that meeting, Norfolk Southern acknowledged that it had not sufficiently planned for the increase in demand for rail car service to Pier 6 and that service had suffered as a result.  In many cases, Norfolk Southern could not provide adequate rail cars in a timely fashion; in other cases, Norfolk Southern could not provide the requested rail cars at all.  Nevertheless, at this meeting in spring 2010, Norfolk Southern promised to rectify these problems within 90 days and to provide better rail service going forward.

3

12.     Since that time, contrary to the promises made, the rail service provided by Norfolk Southern has continued to deteriorate. Norfolk Southern has failed and continues to fail to provide adequate rail cars for shipment of coal from Southern Coal and A&G Coal for sale in domestic and international markets. Time and time again, Norfolk Southern has issued permits to Southern Coal for rail cars, only then to be significantly late in providing them or in many cases failing to provide them at all.

13.     Indeed, based on media reports and other sources of information, it would appear that Norfolk Southern's rail service problems have become widespread. As detailed, for example, in a report prepared by industry researchers at the global financial services firm UBS, rail service by Norfolk Southern over the recent past has generally been poor. As stated by the UBS report: "Some of the coal producers have been up in arms recently, attributing recent Q4 profit warnings in large part to poor railroad service, particularly in the East. . . . Our analysis indicates the coal producers have a valid argument. The service issues are indeed in the East, not the West, and the trail of evidence leads to Norfolk Southern, rather than CSX [the other primary rail carrier in the East], as NS has struggled to maintain service levels while digesting a 10% snap-back in coal volumes last year. It's impacting both domestic and export deliveries, with delayed high-margin export shipments particularly painful for the coal producers." UBS Investment Research, *Rail Coal Transportation* at 1 (Jan. 19, 2011). A copy of the UBS report is attached as "Exhibit A."

14.     These problems have become endemic. Three recent examples of requests for rail cars by A&G Coal illustrate the problem.

15.     *First*, in August 2010, A&G Coal sought rail car service from Norfolk Southern to transport metallurgical coal from loading facilities in Virginia to Burns Harbor, Indiana. In

4

response to this request, Norfolk Southern provided permits for two trains of rail cars. Norfolk Southern, however, only sent one train, cancelling the permit for the other. Norfolk Southern explained that it was cancelling the second train because a tunnel was closing for maintenance and the train supposedly would not get past the tunnel in time. When Norfolk Southern refused to provide the second train, Burns Harbor cancelled that portion of its purchase. A&G Coal then had no choice but to sell this coal at a significant loss on the steam coal market.

16.     When A&G Coal complained to Norfolk Southern about this failure to provide sufficient rail cars and the resulting lost business to Burns Harbor, Norfolk Southern agreed to discuss the issue in a conference call with, among others, Burns Harbor and Southern Coal. During this conference call in early September, Norfolk Southern admitted that it had failed to provide adequate rail service and that the second permitted train could in fact have cleared the tunnel before it closed. As to service issues going forward, Norfolk Southern stated that while it could not provide A&G Coal with 14 to 16 trains for metallurgical coal a month, it could provide 10 to 12 trains. This representation, however, soon proved illusory. In November, 2010, Norfolk Southern provided A&G Coal with only 4 trains to transport metallurgical coal. In December 2010, Norfolk Southern provided A&G Coal with only 6 trains to transport metallurgical coal.

17.     *Second*, Norfolk Southern issued rail car permits to A&G Coal for 4 trains in November 2010 for transport to Norfolk Southern's pier in Sandusky, Ohio. From the Sandusky pier, the coal is then shipped by boat across Lake Erie to Detroit Edison's facility on Zug Island near Detroit, Michigan. Norfolk Southern, however, only provided 2 of the 4 permitted trains in November. Norfolk Southern subsequently re-issued permits for the 2 cancelled trains for December 6 and 8, 2010; but again, Norfolk Southern failed to provide trains on these dates.

5

A&G Coal then requested new permits for these 2 trains for the week of December 13, 2010. Norfolk Southern, however, responded that it did not have the necessary cars available at that time. These delays ultimately caused Detroit Edison to cancel the permits for these 2 trains because it was getting too late in the year. Shipments by boat to Zug Island from its Sandusky pier are not possible once Lake Erie freezes each winter. Shipments only resume in the spring when the Lake thaws.

18.     As a result of Norfolk Southern's delays, A&G Coal was forced to sell the coal committed to Detroit Edison to other purchasers on the steam coal market at a substantially reduced sale price. In addition, as a result of the delay and ultimately the cancellation of the 2 November trains, 2 additional trains originally planned for December also had to be cancelled. When A&G Coal replaces lost shipments to Detroit Edison in the spring, this will necessarily come at the expense of other shipments to other customers as Norfolk Southern currently cannot provide enough trains and rail cars to handle all orders from A&G Coal. This lost volume represents a significant loss of revenue and profit. Indeed, every time A&G Coal requests a train for loading and Norfolk Southern fails to provide the needed rail cars or provides them late, A&G's Coals sales volumes and profits decline and can almost never be recovered. Moreover, these problems with rail service have negatively impacted the business relationship between A&G Coal and Detroit Edison and could hinder contract negotiations in the future.

19.     *Third*, Norfolk Southern issued A&G Coal rail car permits for 6 trains in November and December to transport approximately 60,000 tons of metallurgical coal to Integrity. As a result of Norfolk Southern's failure to meet its obligations, Integrity had to cancel permits for 2 of the 6 trains, meaning that A&G Coal was only able to ship 40,000 tons of the coal purchased by Integrity. A&G Coal had to sell the remaining 20,000 tons on the steam coal

market in December at a substantially reduced price. When A&G Coal replaces these lost shipments to Integrity, this will necessarily come at the expense of other shipments to other customers as Norfolk Southern currently cannot provide enough trains and rail cars to handle all orders from A&G Coal. As noted above, because Norfolk Southern cannot provide enough rail cars to meet existing demand, this lost volume represents a significant loss of revenue and profit that can almost never be recovered. To make matters even worse, these replacement shipments to Integrity are based on a contract price that is now well below today's market price.

20.     In many instances, delays in obtaining rail cars have been compounded by the fact that other railroad assets are not being fully utilized. For example, at present Norfolk Southern only has enough personnel on staff to operate one side of Pier 6 at Lamberts Point at a time. As a result, the Pier can only load one vessel at a time when it has the capacity to load two at a time. This results in significant delays in the loading of ocean-going vessels and delivery of the coal to foreign customers.

21.     Southern Coal and A&G Coal have repeatedly raised concerns regarding Norfolk Southern's failure to perform on these and several other occasions. While Norfolk Southern has acknowledged the problems and promised to fix them, Norfolk Southern has continued to fall short. In fact, the problems have only gotten worse. For November and December 2010, over half of the cars for metallurgical coal permitted by Norfolk Southern never even arrived. This continuing failure on the part of Norfolk Southern has caused, and continues to cause, tremendous damage to Southern Coal and its subsidiaries and is threatening their ability to continue their business.

## Norfolk Southern's Defamation and Disparagement of Southern Coal

22.    To make matters worse, employees of Norfolk Southern, in an apparent attempt to excuse their own failures and shift the blame elsewhere, have been falsely disparaging Southern Coal and A&G Coal to its customers.

23.    Southern Coal and its subsidiaries have been working for several years to expand into the Italian steel market. In late 2010, A&G Coal entered into sales contracts with two of the three primary Italian steel producers, Ilva S.p.a. ("Ilva") and Lucchini S.p.a. ("Lucchini"). Together, these contracts represent a significant business opportunity for Southern Coal worth approximately $175 million in potential revenue in the next year alone.

24.    In recent weeks, employees of Norfolk Southern have made false, defamatory, and disparaging remarks regarding Southern Coal to both Ilva and Lucchini. These baseless accusations impugn the reputations of Southern Coal and A&G Coal and endanger their existing and potential business relationships. Unless action is taken immediately to put an end to these defamatory and disparaging remarks, the consequences could be enormous and may jeopardize the very viability of Southern Coal's future. The statements made to Ilva and Lucchini are discussed in turn below.

### *Norfolk Southern's Disparaging Statements to Ilva*

25.    A&G Coal entered into an agreement with Ilva S.p.a. on November 17, 2010 for the purchase of 39,200 tons of high volatility metallurgical coal. Southern Coal worked with Ilva for over a year to reach this agreement. During that time, the parties undertook extensive investigation, laboratory testing, and study to determine whether the coal from A&G Coal would meet Ilva's requirements. Based on the positive results of that work, Ilva agreed to a test shipment of 39,200 tons of coal from A&G Coal. If this test shipment is successful, the parties

8

expect and intend to enter into a year-long contract for the sale of approximately 537,600 tons of high volatility metallurgical coal to Ilva over the next year.

26.     Before finalizing the November 17 Agreement, the parties took steps to line up the necessary transportation arrangements, both from A&G Coal's mine to the port and from the port to Italy. These arrangements provided that the coal would be loaded onto the vessel SKS Mersey at Norfolk Southern's pier in Lamberts Point, Virginia. Representatives for Ilva confirmed on November 10, 2010, that the January 11, 2011 appointment with Norfolk Southern to load the shipment was "already in place." Norfolk Southern was supposed to provide rail cars to transport the coal to Pier 6 by January 7, 2011, so that the vessel could be loaded on January 11, 2011. Norfolk Southern, however, failed to provide these trains as required.

27.     In addition to the November 17 Agreement providing for test shipment of high volatile metallurgical coal, A&G Coal and Ilva had also entered into a separate contract for the sale of four vessels of mid-volatile metallurgical coal with the first vessel to load in February 2011.

28.     On or about January 13, 2011, Mr. Gianmario Bianchi, the head of Ilva's coal purchasing department, called Norfolk Southern inquiring as to why rail cars had not yet been provided to transport the test shipment of high volatile metallurgical coal from Southern Coal's mine to port, where the SKS Mersey was waiting. In an apparent attempt to excuse its own failures, Norfolk Southern made several disparaging and patently false statement regarding Southern Coal, as detailed in an e-mail from Ignazio Porcari, a third party in Italy who helped arrange for Southern Coal's sale of coal to Ilva. A copy of Mr. Porcari's e-mail is attached as "Exhibit B." As Mr. Porcari's disturbing e-mail reflects, Norfolk Southern asserted that Southern Coal did not have the coal on hand as it had been shipped to other customers. This

9

claim was, and is, absolutely false and without any basis in fact. Mr. Bianci also inquired about obtaining a February 25, 2011 load date for the first shipment of mid-volatile metallurgical coal under the other contract with A&G Coal. Representatives for Norfolk Southern expressed reluctance to set a load date for this shipment, however, asserting, again falsely and without any basis, that Southern Coal is known on the market "as a non performing company" and questioned the ability of Southern Coal to perform its contract with Ilva.

29.     These disparaging, slanderous, and patently untrue comments undermine and jeopardize Southern Coal's business relationship with Ilva and other customers. Indeed, as a result of these accusations from Norfolk Southern, Ilva expressed "alarm" and requested further written assurances from A&G Coal that it could perform on the contract as promised.

30.     A&G Coal has attempted to reassure Ilva of its (A&G Coal's) ability and willingness to perform its obligations. Unfortunately, due to Norfolk Southern's failure to meet the permitted delivery date for the rail cars at the Paragon loading point in Wise County, and additional delays in getting the rail cars to Lamberts Point, the last of the coal from A&G Coal was not loaded on the SKS Mersey until Tuesday, January 25, 2011, more than two weeks late. Thus, A&G Coal and Southern Coal are gravely concerned that its prospective business relationship with Ilva may be irretrievably damaged and that its pending one-year contract with Ilva, the terms of which have already been negotiated but not yet been finalized by signatures, may fall through.

### Norfolk Southern's Disparaging Statements to Lucchini

31.     Remarkably, employees of Norfolk Southern have made false, defamatory, and disparaging remarks not only to Ilva, but also to agents of Lucchini S.p.a., another important customer of A&G Coal.

32.     A&G Coal entered into a Sales Agreement with Lucchini on November 26, 2010. Under the terms of this Sales Agreement, Lucchini agreed to purchase 33,600 tons of high volatile metallurgical coal for its Trieste Works facility in Italy. As with the November 17 Agreement with Ilva, this contract with Lucchini was for a test shipment. That is, if A&G Coal is able to provide this coal in a timely manner, and if the coal provided meets Lucchini's specifications, then the parties have an understanding that Lucchini will then enter into a year-long contract to purchase coal. Under that agreement, Lucchini would agree to buy between 89,600 and 134,400 tons of coal over the course of the first year. In subsequent years, these amounts could increase to as much as 224,000 to 336,000 tons of coal annually. As a result, this test shipment with Lucchini represents a substantial business opportunity for A&G Coal and Southern Coal.

33.     Norfolk Southern originally promised trains to A&G Coal to transport Lucchini's coal on January 4, 5, and 6, 2011. But once again, Norfolk Southern failed to deliver as promised. These trains were then promised on January 10, 13, and 14, but Norfolk Southern did not deliver then either. Instead, the first train did not arrive until Sunday, January 23, 2011. It is unclear when the remaining trains will be delivered. As with the Ilva shipment, Norfolk Southern's failure to provide timely rail car service threatens the developing relationship with Lucchini.

34.     On January 21, 2011, Lucchini learned that Norfolk Southern had told Capes Shipping (the shipping agent for Lucchini) that Southern Coal could not perform its contractual obligations. In addition, Lucchini learned that Norfolk Southern would not confirm a load date for a potential shipment of coal from Southern Coal to Lucchini in March 2011 (presumably under the anticipated year-long contract between the parties) on grounds that Southern Coal is a

"non performing company." The pertinent facts are set forth in e-mails from Ignazio Porcari, which are attached as "Exhibit C." Like Ilva, Lucchini has expressed alarm over A&G Coal's ability to perform its contract and reliably deliver coal. Again, these disparaging, slanderous, and patently untrue comments undermine and jeopardize Southern Coal's business relationship with Lucchini and other customers.

35.    A&G Coal has attempted to reassure Lucchini of its (A&G Coal's) ability and willingness to perform its obligations. Unfortunately, due to Norfolk Southern's failure to meet the permitted delivery date for the rail cars at the Paragon loading point in Wise County, it is still unclear when Norfolk Southern will provide sufficient rail cars to transport the test shipment to port. A&G Coal and Southern Coal are gravely concerned that its prospective business relationship with Lucchini may be irretrievably damaged and that its anticipated one-year contract with Lucchini may fall through.

### Harm Posed by Norfolk Southern's Actions

36.    Based on its conversations with Ilva and Lucchini, Norfolk Southern knew about the developing business relationships these companies had with Southern Coal. Indeed, the context of Norfolk Southern's conversations with the two companies was to establish loading dates for not just current but future coal shipments, as well. In this context, Norfolk Southern's disparaging, slanderous, and patently untrue comments directly undermine, threaten, and jeopardize Southern Coal's contracts and new business relationships with Ilva and Lucchini. These two business relationships, which are still in their early and formative stages, are worth approximately $175 million in revenue over the next year. The long-term damage done to these relationships with Ilva and Lucchini, however, is incalculable. In the wake of Norfolk Southern's false statements, both Ilva and Lucchini expressed serious concern about Southern

Coal's ability to meet its commitments. As to Ilva in particular, Mr. Porcari has stated that he faced "extremely tough" questioning regarding Norfolk Southern's false statements. In short, Southern Coal's business reputation has been tarnished in the eyes of both companies. Further, the potential of any lost opportunity to do business with these companies, in this market, cannot be calculated or adequately quantified.

37.     The potential loss of the business opportunities with Ilva and Lucchini could have enormous consequences for not just Southern Coal but its employees and Wise County more generally. Further, in an effort to enter into these sales agreements with Ilva and Lucchini, A&G Coal is competing with coal companies from around the world. Should Ilva and Lucchini decide not to purchase coal from A&G Coal going forward, but instead select a foreign competitor, the loss of business would negatively affect overall U.S. exports.

38.     Southern Coal and A&G Coal are also concerned that Norfolk Southern may have already made disparaging comments to other customers beyond Ilva and Lucchini. Regardless, Norfolk Southern's defamatory allegations pose substantial harm to the business reputation of Southern Coal and A&G Coal in the eyes of other existing and potential customers, which harm may never be fully known.

39.     To prevent Ilva and/or Lucchini from terminating their contracts and future business relationships with Southern Coal and to avoid lost business opportunities that can never be regained, Norfolk Southern's disparaging remarks must be brought to an immediate halt. Moreover, to mitigate the harm that has already been done, Norfolk Southern must retract its false statements and affirmatively declare that any such allegations against Southern Coal and A&G Coal are without any factual basis.

13

40.     Even beyond these immediate incidents, Norfolk Southern's failure to provide rail service over the past year or so has been financially devastating to Southern Coal. In 2010, for example, Southern Coal and its subsidiaries were unable to meet their projected coal deliveries due to inadequate rail service. Southern Coal had everything it needed (equipment, personnel, product, etc.) to deliver the forecasted tonnage for 2010, which was in line with the tonnage delivered in 2008 and 2009. The primary basis for the failure to meet the 2010 projections was that Southern Coal could not ship enough product due to Norfolk Southern's failure to provide adequate rail service. As a result, Southern Coal and its subsidiaries lost profits and value as companies in the amount of approximately $500 million.

Further affiant saith not.

_____
James C. Justice III


Sworn to and subscribed before me
this the **27ᵗʰ** day of January, 2011.

_____
Signature of Notary Public

Joshua D. Nunley
_____
Print or Type Name of Notary Public

My commission expires: **12-18-2019**



OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
JOSHUA D. NUNLEY
106 LOCKHEED DRIVE
BEAVER, WV 25813
My commission expires December 18, 2019

14

# Exhibit A

 **UBS**

**Global Equity Research**

Americas

Railroads

Sector Comment

## UBS Investment Research
## Rail Coal Transportation

# The Blame Game

**19 January 2011**

www.ubs.com/investmentresearch

■ **Arch, Massey and Alpha Natural on the warpath**
Some of the coal producers have been up in arms recently, attributing recent Q4 profit warnings in large part to poor railroad service, particularly in the East. In this note we analyze coal train operating data to see if there's fire behind the smoke.

■ **Beating a dead horse**
Our analysis indicates the coal producers have a valid argument. The service issues are indeed in the East, not the West, and the trail of evidence leads to Norfolk Southern, rather than CSX, as NS has struggled to maintain service levels while digesting a 10% snap back in coal volumes last year. It's impacting both domestic and export deliveries, with delayed high margin export shipments particularly painful for the coal producers.

■ **NS service outlook not great if you sell or burn coal**
Railroads are slow moving animals and operations at NS are going to take time to return to satisfactory levels, and in our view it can only happen if NS gets ahead of the game in terms of crewing and locomotive resources (hitting incremental margins), and the rebound in coal volumes substantially moderates in 2011. We're forecasting 6% coal volume growth for NS this year, which does not constitute a substantial slowdown, so our advice to coal producers and customers on Norfolk's system is that patience is a virtue.

**Rick Paterson**
Analyst
rick.paterson@ubs.com
+1-212-713 7944
**Elizabeth Mielke**
Associate Analyst
elizabeth.mielke@ubs.com
+1-212-713 3683
**Brian Roberts, CFA**
Associate Analyst
brian.roberts@ubs.com
+1 212 713 2354

This report has been prepared by UBS Securities LLC
ANALYST CERTIFICATION AND REQUIRED DISCLOSURES BEGIN ON PAGE 8.
UBS does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

# What Coal Producer's are Saying

Over the years, we have often heard the railroads blame coal volume weakness on production issues at the mines and the coal producers attribute shortages in tonnage sold to subpar service by the rails. Q4/10 is a case of the latter.

Railroad service is—to a degree—cyclical and coal producers' complaints over service dropped off in tandem with railroad coal transportation volumes during 2009 and the first part of 2010, as rails were able to move fewer shipments at higher efficiency levels. However, we began to hear the first murmurs of disgruntlement in the latter part of last year as rail coal volumes began to rebound. At Alpha Natural's September analyst day, when asked about export coal volumes, management mentioned that "*there have been challenges with railroads in getting some coal to the ports.*" On its third quarter 2010 earnings call, Arch Coal attributed the decline in met coal sales' share of its total Central App volume from Q2 to Q3 partly to *"rail and ship delays."*

Coal producers' frustrations with Eastern rail service appear to be mounting more recently. Heading into Q4/10 earnings season, a handful of coal producers with mine operations in the East have revised previously issued guidance in light of what they claimed to be a combination of production shortfalls and rail service issues.

**Like cats and dogs...**

On January 5, Massey announced that its total produced tons sold in Q4 were lower than what was projected in its prior guidance:

**Massey**

> "*The 1.4 million ton shortfall in fourth quarter coal shipments was largely attributable to lower than anticipated production, inconsistent rail service and delays of export shipments at the ports during the quarter. Total coal production for the quarter fell short of expectations by approximately 800,000 tons.*"

On January 11, Arch Coal lowered its 2010 EPS guidance range, with its chairman and CEO Steven Leer stating:

**Arch**

> "*Lower shipment levels, partially driven by poor Eastern rail service, contributed to the guidance revision for 2010. In addition, the Mountain Laurel operation was impacted in December by geologic challenges, which marginally affected our planned production during the quarter.*"

The most recent allegation of poor Eastern rail service came from Alpha Natural on January 14. The company raised its guidance range for cost of coal sales in the East to $60.50-61.50 per ton from $57-58.50 per ton. CEO Kevin Crutchfield explained the guidance revision by saying:

**Alpha Natural**

> "*Our operating results in the East were impacted by several factors, including poor rail service, severe weather and delayed export shipments at the ports during the fourth quarter, as well as reduced shipments and resultant higher per ton costs from our Pittsburgh #8 mines primarily due to periodic sandstone intrusions encountered at our Emerald Mine.*"

# Does the Evidence Support It?

## Coal Unit Train Operating Performance

In order to verify and test the claims made by the coal producers, we examined the operating performance data from the Association of American Railroads on just the coal unit train business. The coal segment of the rail business is usually a smoothly running piece of the network in which very long, heavy trains run back and forth from the coal mine to either a port facility for export, or a utility which will burn the black stuff as fuel for electricity. We examined average train speeds (i.e. "velocity", in mph) for only the coal unit trains at UP, BNSF, NS, and CSX.

## UP Strong; BNSF Struggled with Volumes

Starting in the West, Chart 1 shows the annual progression of fourth quarter average train speeds since Q4/06. We've used 2006 as the starting point because that represented last cycle's peak volume year and was the last of three strong years of volume growth that pushed the rail system, nation-wide, to its limit. In other words, it's when service levels were at their worst and—legitimately—coal producer and customer complaints were also peaking.

**It was all downhill from 2006**

Looking at the individual railroads, UP appears strongest, although it's somewhat a function of easy comps as UP had the biggest collapse in service levels between 2003-2006. However, Q4/10 represented the fourth year in a row of consecutive y/y improvement so obviously no cause for rising service complaints. UP also had the "advantage" of the lowest growth in coal volumes in Q4/10 (+3.2% y/y) and growth is the enemy of asset turns in this industry.

**In the short term, higher growth = weaker service**

In contrast, BN clearly struggled in Q4/10 to handle an 11% y/y increase in coal loadings, which showed up loud and clear in velocity, down 16%. When we observe over a longer time frame, however, the average speed of 20 mph is essentially the same as Q4/07 and Q4/08 and a 10% improvement over Q4/06. So our bottom line take on BN is that customers and coal producers essentially received a one year service "windfall" in 2009 as BN's loadings fell 13% and asset turns accelerated, but with volumes now normalizing so have service levels.

**BN struggled to reabsorb a 11% rebound in coal in Q4/10**

**Chart 1: Q4 Coal Unit Train Velocity at UP & BNSF, 2006-2010**



Source: UBS & AAR

**Chart 2: Sequential Coal Unit Train Velocity at UP & BNSF**



Source: UBS & AAR

Chart 2 shows the same data for UP and BN sequentially from Q4/09 through Q4/10, and once again these railroads look to be in the clear. While coal producer complaints increased in Q4, both railroads actually improved service levels sequentially into Q4, albeit very modestly in the case of BN.

## Western Car Turns also Show a Green Light

Coal is moved in either open topped hoppers or gondolas, and in the charts below we've divided the number of coal loads in the quarter by the number of hopper and gondola cars on line to derive average car cycles. For example, the average BN coal car made 8.5 loaded trips in Q4. One big caveat, however, is that not all open topped hoppers are used exclusively for coal and neither are all gondolas dedicated only to coal; hence there is an error factor in this data, but we believe it remains somewhat insightful. From a y/y perspective, the data looks strong, with BNSF consistent and UP improving in Q4/10 vs the prior year. The sequential data in Chart 4 also shows a green light with the "BN consistent, UP improving" theme again apparent.

**Imperfect data but no sign of a red flag**

**Chart 3: Q4 Car Cycles, UP & BNSF (2006-2010)**



Source: UBS & AAR

**Chart 4: Sequential Car Cycles, UP & BNSF (Q4/09 – Q4/10)**



Source: UBS & AAR

## Western Conclusion: UP and BN off the Hook

Coal producer complaints have tended to zero in on the Eastern railroads, and the reduced level of noise on the western rails is certainly corroborated by our analysis above. So let's move on to the East…

Case 2:11-cv-00002-JCT   Document 1-1   Filed 01/31/11   Page 43 of 58   Pageid#: 47

# This Story is in the East
## Solid Coal Ops at CSX; Buck Stops at NS

Chart 5 shows the Q4 velocity data from 2006 through 2010, with CSX clearly operating at a higher level than NS.

**Chart 5: Q4 Coal Unit Train Velocity at CSX & NS, 2006-2010**



Source: AAR

**Chart 6: Sequential Coal Unit Train Velocity at CSX & NS**



Source: AAR

CSX recorded an average speed of 16.7 mph in Q4/10, which was a 3.5% degradation from Q4/09 in the face of a 4.7% rebound in coal volumes y/y. Not too shabby and in our opinion not a change of sufficient magnitude to suddenly trigger profit warnings by the coal producers. This velocity number also looks satisfactory in historical terms given it's marginally above the five year average of 16.5 mph. Looking at the sequential data on Chart 6, we see a similar picture for CSX. Coal train speeds did erode marginally (1.8%) from Q3 into Q4 last year, but both quarters in the back half of the year were improvements over Q1 and Q2; i.e. CSX coal operations actually got stronger in the back half.

**CSX coal operations actually improved in H2/10**

We've been critical of NS operations since early 2010 and involuntarily find ourselves here once again. The charts speak for themselves, but the most telling one is chart 5 with an average NS train speed of just 15 mph, the second y/y decline in a row, and 10% below CSX (to be fair to NS mix differences distort direct rail-to-rail comparisons). Another way to think about this is that if you're a coal producer or coal customer, you're receiving the same level of service from NS now that you received back in 2006 when the nation-wide system was stretched to breaking point and service was awful. In Norfolk's defense the degradation in service levels in Q4/10 was driven by the pressure to handle an unprecedented 12% snap back in coal volumes; however coal producers and customers don't care and in their eyes NS doesn't get a pass for this fact. Conversely, from an investor's point of view, 12% more coal at a cost of 6.3% in asset turns is not a bad trade.

**NS is struggling to handle the double digit coal rebound**

In Chart 7 we've tried to show the relationship between the typically negative impact of higher volumes on velocity with our "Coefficient of Efficiency" chart (patent pending). We've compared Q4/10 with Q4/09 with the chart showing the degree of degradation in coal train speeds for every one percent increase in coal volumes. For example Norfolk Southern gave up 0.55% of unit train speed for

every 1% increase in coal volume growth in Q4. The interesting takeaway here is that NS is not an outlier in the context of weaker train speeds *relative* to volume growth. It just had the most coal growth and train speeds fell from an already low base, which seems to have snapped the patience of producers and, no doubt, customers.

**Chart 7: Coefficient of Efficiency (Q4/10 vs. Q4/09)**



Source: UBS & AAR
UP has a positive number because y/y train speeds actually increased.

The good news, if there's any, is in Chart 6, which shows that NS coal train speeds stopped falling in Q2 last year and should start to come off the bottom if, in our view, two things happen:

i) NS gets ahead of the game in terms of bringing resources to bear— primarily crews and locomotives—although this has negative consequences in terms of 2011 incremental margins; and

ii) The rate of coal volume growth going forward moderates, taking pressure off operations. For what it's worth our 2011 coal volume forecast for NS is +6%. We only have moderate conviction in this estimate, but if it transpires it's a big enough number to keep operations under pressure and service levels unsatisfactory.

**NS service unlikely to improve until volume growth subsides and it can operational "regroup"**

## What About Eastern Car Turns?

Again remembering the caveat that cars on line data can't be narrowed specifically to coal cars, Charts 8 and 9 show the eastern quarterly car turns. The turn numbers are predictably lower than the western railroads given the eastern rails service many small underground mines with higher grades (i.e. mountains) vs. BN and UP that serve relatively few large surface mines with flood loaders. The bottom line regarding these charts is that they're inconclusive. Car turns appears to marginally weaken sequentially but were better y/y.

**Eastern car turns inconclusive**

There's also a capital strategy difference here. CSX tends to encourage customers to supply their own coal cars, allowing CSX to avoid the capital cost and in return charging the customer a lower rate. NS in contrast likes to own more of the coal cars, increasing capex, but allowing for "pooling".

**Coal car pooling is a structural advantage for NS**

Case 2:11-cv-00002-JCT   Document 1-1   Filed 01/31/11   Page 45 of 58   Pageid#: 49

To use a simple example, a location on CSX's network may have 200 empty cars, and there's demand to move 150 loads of coal for a customer, but the 200 cars represent 100 each owned by two different customers and the cars are dedicated only to those customer's respective loads. Hence CSX is 50 cars short. In the same example, NS could handle the loads immediately and therefore—all else being equal—should have faster cycle times than CSX given this pooling advantage, which is visible in the charts below.

**NS should cycle coal cars faster than CSX, *ceteris paribus***

**Chart 8: Q4 Car Cycles, CSX & NS (2006-2010))**



Source: UBS & AAR

**Chart 9: Sequential Car Cycles, CSX & NS (Q4/09 – Q4/10)**



Source: UBS & AAR

## Eastern Conclusions: NS Needs to Lift its Game

We're getting tired of beating up on NS, but the numbers are what they are. The bottom line here is that coal producers and customers do indeed have cause to be unhappy with the railroads, but it's in the East, not the West, and the buck stops in Norfolk, Virginia, rather than Jacksonville, Florida.

Is there case to be made for a coal market share shift from NS to CSX? Not really because most of this business is captive.

■ **Statement of Risk**

Risks to railroad stocks include economic (volumes and pricing), financial (debt), event (M&A), and the impact of volatile fuel prices. There is also the risk of valuations multiple compression as investors rotate away from the sector at different stages of the business cycle.


■ **Analyst Certification**

Each research analyst primarily responsible for the content of this research report, in whole or in part, certifies that with respect to each security or issuer that the analyst covered in this report: (1) all of the views expressed accurately reflect his or her personal views about those securities or issuers; and (2) no part of his or her compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed by that research analyst in the research report.

## Required Disclosures

This report has been prepared by UBS Securities LLC, an affiliate of UBS AG. UBS AG, its subsidiaries, branches and affiliates are referred to herein as UBS.

For information on the ways in which UBS manages conflicts and maintains independence of its research product; historical performance information; and certain additional disclosures concerning UBS research recommendations, please visit www.ubs.com/disclosures. The figures contained in performance charts refer to the past; past performance is not a reliable indicator of future results. Additional information will be made available upon request. UBS Securities Co. Limited is licensed to conduct securities investment consultancy businesses by the China Securities Regulatory Commission.

### UBS Investment Research: Global Equity Rating Allocations

| UBS 12-Month Rating | Rating Category | Coverage[1] | IB Services[2] |
|---|---|---|---|
| Buy | Buy | 49% | 40% |
| Neutral | Hold/Neutral | 42% | 35% |
| Sell | Sell | 8% | 21% |
| UBS Short-Term Rating | Rating Category | Coverage[3] | IB Services[4] |
| Buy | Buy | less than 1% | 14% |
| Sell | Sell | less than 1% | 0% |

1:Percentage of companies under coverage globally within the 12-month rating category.
2:Percentage of companies within the 12-month rating category for which investment banking (IB) services were provided within the past 12 months.
3:Percentage of companies under coverage globally within the Short-Term rating category.
4:Percentage of companies within the Short-Term rating category for which investment banking (IB) services were provided within the past 12 months.

Source: UBS. Rating allocations are as of 31 December 2010.

### UBS Investment Research: Global Equity Rating Definitions

| UBS 12-Month Rating | Definition |
|---|---|
| Buy | FSR is > 6% above the MRA. |
| Neutral | FSR is between -6% and 6% of the MRA. |
| Sell | FSR is > 6% below the MRA. |
| UBS Short-Term Rating | Definition |
| Buy | Buy: Stock price expected to rise within three months from the time the rating was assigned because of a specific catalyst or event. |
| Sell | Sell: Stock price expected to fall within three months from the time the rating was assigned because of a specific catalyst or event. |

## KEY DEFINITIONS

**Forecast Stock Return (FSR)** is defined as expected percentage price appreciation plus gross dividend yield over the next 12 months.

**Market Return Assumption (MRA)** is defined as the one-year local market interest rate plus 5% (a proxy for, and not a forecast of, the equity risk premium).

**Under Review (UR)** Stocks may be flagged as UR by the analyst, indicating that the stock's price target and/or rating are subject to possible change in the near term, usually in response to an event that may affect the investment case or valuation.

**Short-Term Ratings** reflect the expected near-term (up to three months) performance of the stock and do not reflect any change in the fundamental view or investment case.

**Equity Price Targets** have an investment horizon of 12 months.

## EXCEPTIONS AND SPECIAL CASES

**UK and European Investment Fund ratings and definitions are:** Buy: Positive on factors such as structure, management, performance record, discount; Neutral: Neutral on factors such as structure, management, performance record, discount; Sell: Negative on factors such as structure, management, performance record, discount.

**Core Banding Exceptions (CBE):** Exceptions to the standard +/-6% bands may be granted by the Investment Review Committee (IRC). Factors considered by the IRC include the stock's volatility and the credit spread of the respective company's debt. As a result, stocks deemed to be very high or low risk may be subject to higher or lower bands as they relate to the rating. When such exceptions apply, they will be identified in the Company Disclosures table in the relevant research piece.

Research analysts contributing to this report who are employed by any non-US affiliate of UBS Securities LLC are not registered/qualified as research analysts with the NASD and NYSE and therefore are not subject to the restrictions contained in the NASD and NYSE rules on communications with a subject company, public appearances, and trading securities held by a research analyst account. The name of each affiliate and analyst employed by that affiliate contributing to this report, if any, follows.

**UBS Securities LLC:** Rick Paterson; Elizabeth Mielke; Brian Roberts, CFA.

## Company Disclosures

| Company Name | Reuters | 12-mo rating | Short-term rating | Price | Price date |
|---|---|---|---|---|---|
| CSX Corp.[2, 4, 5, 6, 16] | CSX.N | Buy | N/A | US$68.31 | 19 Jan 2011 |
| Norfolk Southern Corp.[16, 18] | NSC.N | Buy | N/A | US$64.85 | 19 Jan 2011 |
| Union Pacific Corp.[16] | UNP.N | Neutral | N/A | US$97.30 | 19 Jan 2011 |

Source: UBS. All prices as of local market close.
Ratings in this table are the most current published ratings prior to this report. They may be more recent than the stock pricing date

2.   UBS AG, its affiliates or subsidiaries has acted as manager/co-manager in the underwriting or placement of securities of this company/entity or one of its affiliates within the past 12 months.

4.   Within the past 12 months, UBS AG, its affiliates or subsidiaries has received compensation for investment banking services from this company/entity.

5.   UBS AG, its affiliates or subsidiaries expect to receive or intend to seek compensation for investment banking services from this company/entity within the next three months.

6.   This company/entity is, or within the past 12 months has been, a client of UBS Securities LLC, and investment banking services are being, or have been, provided.

16.   UBS Securities LLC makes a market in the securities and/or ADRs of this company.

18.   The U.S. equity strategist, a member of his team, or one of their household members has a long common stock position in Norfolk Southern Corp.

Unless otherwise indicated, please refer to the Valuation and Risk sections within the body of this report.

## CSX Corp. (US$)



Source: UBS; as of 19 Jan 2011

## Norfolk Southern Corp. (US$)



Source: UBS; as of 19 Jan 2011

## Union Pacific Corp. (US$)



Source: UBS; as of 19 Jan 2011

UBS 11

Case 2:11-cv-00002-JCT   Document 1-1   Filed 01/31/11   Page 50 of 58   Pageid#: 54

Note: On August 4, 2007 UBS revised its rating system. (See 'UBS Investment Research: Global Equity Rating Definitions' table for details). From September 9, 2006 through August 3, 2007 the UBS ratings and their definitions were: Buy 1 = FSR is > 6% above the MRA, higher degree of predictability; Buy 2 = FSR is > 6% above the MRA, lower degree of predictability; Neutral 1 = FSR is between -6% and 6% of the MRA, higher degree of predictability; Neutral 2 = FSR is between -6% and 6% of the MRA, lower degree of predictability; Reduce 1 = FSR is > 6% below the MRA, higher degree of predictability; Reduce 2 = FSR is > 6% below the MRA, lower degree of predictability. The predictability level indicates an analyst's conviction in the FSR. A predictability level of '1' means that the analyst's estimate of FSR is in the middle of a narrower, or smaller, range of possibilities. A predictability level of '2' means that the analyst's estimate of FSR is in the middle of a broader, or larger, range of possibilities. From October 13, 2003 through September 8, 2006 the percentage band criteria used in the rating system was 10%.

## Global Disclaimer

This report has been prepared by UBS Securities LLC, an affiliate of UBS AG. UBS AG, its subsidiaries, branches and affiliates are referred to herein as UBS. In certain countries, UBS AG is referred to as UBS SA.

This report is for distribution only under such circumstances as may be permitted by applicable law. Nothing in this report constitutes a representation that any investment strategy or recommendation contained herein is suitable or appropriate to a recipient's individual circumstances or otherwise constitutes a personal recommendation. It is published solely for information purposes, it does not constitute an advertisement and is not to be construed as a solicitation or an offer to buy or sell any securities or related financial instruments in any jurisdiction. No representation or warranty, either express or implied, is provided in relation to the accuracy, completeness or reliability of the information contained herein, except with respect to information concerning UBS AG, its subsidiaries and affiliates, nor is it intended to be a complete statement or summary of the securities, markets or developments referred to in the report. UBS does not undertake that investors will obtain profits, nor will it share with investors any investment profits nor accept any liability for any investment losses. Investments involve risks and investors should exercise prudence in making their investment decisions. The report should not be regarded by recipients as a substitute for the exercise of their own judgement. Past performance is not necessarily a guide to future performance. The value of any investment or income may go down as well as up and you may not get back the full amount invested. Any opinions expressed in this report are subject to change without notice and may differ or be contrary to opinions expressed by other business areas or groups of UBS as a result of using different assumptions and criteria. Research will initiate, update and cease coverage solely at the discretion of UBS Investment Bank Research Management. The analysis contained herein is based on numerous assumptions. Different assumptions could result in materially different results. The analyst(s) responsible for the preparation of this report may interact with trading desk personnel, sales personnel and other constituencies for the purpose of gathering, synthesizing and interpreting market information. UBS is under no obligation to update or keep current the information contained herein. UBS relies on information barriers to control the flow of information contained in one or more areas within UBS, into other areas, units, groups or affiliates of UBS. The compensation of the analyst who prepared this report is determined exclusively by research management and senior management (not including investment banking). Analyst compensation is not based on investment banking revenues, however, compensation may relate to the revenues of UBS Investment Bank as a whole, of which investment banking, sales and trading are a part.

The securities described herein may not be eligible for sale in all jurisdictions or to certain categories of investors. Options, derivative products and futures are not suitable for all investors, and trading in these instruments is considered risky. Mortgage and asset-backed securities may involve a high degree of risk and may be highly volatile in response to fluctuations in interest rates and other market conditions. Past performance is not necessarily indicative of future results. Foreign currency rates of exchange may adversely affect the value, price or income of any security or related instrument mentioned in this report. For investment advice, trade execution or other enquiries, clients should contact their local sales representative. Neither UBS nor any of its affiliates, nor any of UBS' or any of its affiliates, directors, employees or agents accepts any liability for any loss or damage arising out of the use of all or any part of this report. For financial instruments admitted to trading on an EU regulated market: UBS AG, its affiliates or subsidiaries (excluding UBS Securities LLC and/or UBS Capital Markets LP) acts as a market maker or liquidity provider (in accordance with the interpretation of these terms in the UK) in the financial instruments of the issuer save that where the activity of liquidity provider is carried out in accordance with the definition given to it by the laws and regulations of any other EU jurisdictions, such information is separately disclosed in this research report. UBS and its affiliates and employees may have long or short positions, trade as principal and buy and sell in instruments or derivatives identified herein.

Any prices stated in this report are for information purposes only and do not represent valuations for individual securities or other instruments. There is no representation that any transaction can or could have been effected at those prices and any prices do not necessarily reflect UBS's internal books and records or theoretical model-based valuations and may be based on certain assumptions. Different assumptions, by UBS or any other source, may yield substantially different results.

**United Kingdom and the rest of Europe:** Except as otherwise specified herein, this material is communicated by UBS Limited, a subsidiary of UBS AG, to persons who are eligible counterparties or professional clients and is only available to such persons. The information contained does not apply to, and should not be relied upon by, retail clients. UBS Limited is authorised and regulated by the Financial Services Authority (FSA). UBS research complies with all the FSA requirements and laws concerning disclosures and these are indicated on the research where applicable. **France:** Prepared by UBS Limited and distributed by UBS Limited and UBS Securities France S.A. UBS Securities France S.A. is regulated by the Autorité des Marchés Financiers (AMF). Where an analyst of UBS Securities France S.A. has contributed to this report, the report is also deemed to have been prepared by UBS Securities France S.A. **Germany:** Prepared by UBS Limited and distributed by UBS Limited and UBS Deutschland AG. UBS Deutschland AG is regulated by the Bundesanstalt fur Finanzdienstleistungsaufsicht (BaFin). **Spain:** Prepared by UBS Limited and distributed by UBS Limited and UBS Securities España SV, SA. UBS Securities España SV, SA is regulated by the Comisión Nacional del Mercado de Valores (CNMV). **Turkey:** Prepared by UBS Menkul Degerler AS on behalf of and distributed by UBS Limited. **Russia:** Prepared and distributed by UBS Securities CJSC. **Switzerland:** Distributed by UBS AG to persons who are institutional investors only. **Italy:** Prepared by UBS Limited and distributed by UBS Limited and UBS Italia Sim S.p.A.. UBS Italia Sim S.p.A. is regulated by the Bank of Italy and by the Commissione Nazionale per le Società e la Borsa (CONSOB). Where an analyst of UBS Italia Sim S.p.A. has contributed to this report, the report is also deemed to have been prepared by UBS Italia Sim S.p.A.. **South Africa:** UBS South Africa (Pty) Limited (Registration No. 1995/011140/07) is a member of the JSE Limited, the South African Futures Exchange and the Bond Exchange of South Africa. UBS South Africa (Pty) Limited is an authorised Financial Services Provider. Details of its postal and physical address and a list of its directors are available on request or may be accessed at http:www.ubs.co.za. **United States:** Distributed to US persons by either UBS Securities LLC or by UBS Financial Services Inc., subsidiaries of UBS AG; or by a group, subsidiary or affiliate of UBS AG that is not registered as a US broker-dealer (a 'non-US affiliate'), to major US institutional investors only. UBS Securities LLC or UBS Financial Services Inc. accepts responsibility for the content of a report prepared by another non-US affiliate when distributed to US persons by UBS Securities LLC or UBS Financial Services Inc. All transactions by a US person in the securities mentioned in this report must be effected through UBS Securities LLC or UBS Financial Services Inc., and not through a non-US affiliate. **Canada:** Distributed by UBS Securities Canada Inc., a subsidiary of UBS AG and a member of the principal Canadian stock exchanges & CIPF. A statement of its financial condition and a list of its directors and senior officers will be provided upon request. **Hong Kong:** Distributed by UBS Securities Asia Limited. **Singapore:** Distributed by UBS Securities Pte. Ltd [mica (p) 039/11/2009 and Co. Reg. No.: 198500648C] or UBS AG, Singapore Branch. Please contact UBS Securities Pte Ltd, an exempt financial adviser under the Singapore Financial Advisers Act (Cap. 110); or UBS AG Singapore branch, an exempt financial adviser under the Singapore Financial Advisers Act (Cap. 110) and a wholesale bank licensed under the Singapore Banking Act (Cap. 19) regulated by the Monetary Authority of Singapore, in respect of any matters arising from, or in connection with, the analysis or report. The recipient of this report must warrant and warrant that they are accredited and institutional investors as defined in the Securities and Futures Act (Cap. 289). **Japan:** Distributed by UBS Securities Japan Ltd to institutional investors only. Where this report has been prepared by UBS Securities Japan Ltd, UBS Securities Japan Ltd is the author, publisher and distributor of the report. **Australia:** Distributed by UBS AG (Holder of Australian Financial Services License No. 231087) and UBS Securities Australia Ltd (Holder of Australian Financial Services License No. 231098) only to 'Wholesale' clients as defined by s761G of the Corporations Act 2001. **New Zealand:** Distributed by UBS New Zealand Ltd. An investment adviser and investment broker disclosure statement is available on request and free of charge by writing to PO Box 45, Auckland, NZ. **Dubai:** The report prepared and distributed by UBS AG Dubai Branch, is intended for Professional Clients only and is not for further distribution within the United Arab Emirates. **Korea:** Distributed in Korea by UBS Securities Pte. Ltd., Seoul Branch. This report may have been edited or contributed to from time to time by affiliates of UBS Securities Pte. Ltd., Seoul Branch. **Malaysia:** This material is authorized to be distributed in Malaysia by UBS Securities Malaysia Sdn. Bhd (253825-x).**India :** Prepared by UBS Securities India Private Ltd. 2/F,2 North Avenue, Maker Maxity, Bandra Kurla Complex, Bandra (East), Mumbai (India) 400051. Phone: +912261556000 SEBI Registration Numbers: NSE (Capital Market Segment): INB230951431 , NSE (F&O Segment) INF230951431, BSE (Capital Market Segment) INB010951437.

The disclosures contained in research reports produced by UBS Limited shall be governed by and construed in accordance with English law.

UBS specifically prohibits the redistribution of this material in whole or in part without the written permission of UBS and UBS accepts no liability whatsoever for the actions of third parties in this respect. Images may depict objects or elements which are protected by third party copyright, trademarks and other intellectual property rights. © UBS 2011. The key symbol and UBS are among the registered and unregistered trademarks of UBS. All rights reserved.



# Exhibit B

-----Original Message-----
From: ignazio.porcari@minmetals.it
Date: Sun, 16 Jan 2011 08:57:36
To: Jay Justice<jcj3@justicecompanies.com>
Reply-To: ignazio.porcari@minmetals.it
Subject: ILVA


Dear Mr. Justice,

On Thu 13 of January I have received a phone call from our customer
ILVA in the person of Mr. Gianmario Bianchi (Head of coal purchase
department).

He was alarmed for the delay of the loading operation of the M/V SKS
Marsey, as he heard from Norfolk Southern that Southern Coal Corp has
not enough cargo available to load this vessel, which is waiting at
Lambert Point.

At the same time Mr. Bianchi tried to fix the appointment with Norfolk
Southern for our next vessel of 65000 Mt with Laycan 20 February - 5
March 2011, and he asked to Norfolk Southern to confirm the 25th of
February as loading date.

Norfolk Southern (Mr. Bianchi said to me on the phone) was quite
reluctant to fix this date, as they (NS) said to ILVA that Southern Coal
is known from the market as a non performing company, so they (NS) were
not so confident that, even confirming the 25th of February as loading
date, Southern Coal should perform the contract.

On side of this, Norfolk Southern reported to ILVA (Mr. Bianchi said on
the phone) that Southern Coal is short on the cargo as the cargo has
been already sold out to other customer, probably INTEGRITY.

As this is our first contract with ILVA, ILVA asked me a formal
declaration that the lack of cargo will be solved as soon as possible,
and to re confirm to them, in written form, that Southern Coal will
perform all the contracts already signed.

ILVA is extremely worry after the information sourced from Norfolk
Southern.

Please provide such written declaration to confirm the performance of
the enforced contracts.

We must make ILVA comfortable after such bad information received from

Norfolk Southern.

We are risking to loose one of the most important customer in the world.

Thank you for your replay

Best regards

Ignazio Porcari

----------------------------

Vice President
Minmetals Italia Srl

(Agent of Southern Coal Corporation in Italy)

Sent from my BlackBerry(r) wireless device

NOTICE: Please do not print this e-mail unless necessary. If you must, please recycle. This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee (or a person authorized to deliver it to the named addressee). It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and notify the sender of the error by replying via email or by calling Frost Brown Todd LLC at (513) 651-6800 (collect), so that our address record can be corrected.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# Exhibit C

From: Ignazio- email
To: Jay Justice
Cc: Tim Hall
Cc: Holly Burns
Cc: Steve Sarver
Cc: Dan Hendrickson
ReplyTo: Ignazio- email
Subject: LUCCHINI - NS TOP URGENT
Sent: Jan 21, 2011 12:06 PM

Jay,

Same story.

NS said to Lucchini that SCC can not perform this cargo, and that if
Lucchini asks for March loading with SCC cargo, NS will not confirm the
load date because SCC is a non performing company ...

Lucchini will follow with written report.

I ll update you

Ignazio


Sent from my BlackBerryR wireless device

Sent from my Verizon Wireless BlackBerry

Da: Ignazio Porcari [mailto:ignazio.porcari@minmetals.it]
Inviato: martedì 25 gennaio 2011 16.11
A: 'jcj3@justicecompanies.com'
Oggetto: LUCCHINI (M/V ROGER M JONES)


Dear Mr. Justice,

On Friday 21st of January  I have received  a phone call from our customer
LUCCHINI in the person of Mrs. Eugenia Brun (Head of coal purchase
department).

She was alarmed  for the delay of the loading operation of the M/V ROGER M
JONES, as she heard from Norfolk Southern  that Southern Coal Corp has not
enough cargo available to load this vessel, which is waiting at Lambert
Point. So she asked me a written report that we (Southern Coal) are able to
perform on time.

On side of that, Mrs. Brun reported to me that she tried to fix the
appointment with Norfolk Southern for their next vessel to be loaded from
Norfolk in March, (we do not have any coal contracted for that), and
Norfolk Southern (Mrs. Brun said to me on the phone) replayed to her that
if
on the Lucchini's March vessel is scheduled also some Southern Coal
quantities, Norfolk Southern should not confirm the loading date.

Mr. Justice, we are risking to lose one important customer in Europe.

Hope you can check it and clarify with Norfolk Southern. I need to replay
to
LUCCHINI as soon as possible.

Thank you for your replay

Best regards

Ignazio Porcari

----------------------------
Vice President
Minmetals Italia Srl
Viale Cesare Battisti 15
27100 Pavia - Italia
www.minmetals.it

(Agent of Southern Coal Corporation in Italy)